**WILLAMETTE TRANSPORT, INC., Plaintiff,**

v.

**CIA. ANONIMA VENEZOLANA DE NAVEGACION, Defendant.**

Civ. A. No. 79–1504.

United States District Court, E. D. Louisiana.

June 5, 1980.

J. Barbee Winston, Edward F. LeBreton, III, New Orleans, La., for plaintiff.

J. Dwight LeBlanc, Jr., Robert B. Fisher, Jr., New Orleans, La., for defendant.

CASSIBRY, District Judge:

## ON MOTION TO STAY OR POST SECURITY

Plaintiff, Willamette Transport, Inc. ("Willamette"), brought this suit to recover damages arising from a collision that occurred on April 15, 1979 about 60 miles from the port of Galveston, Texas. The complaint alleges that the collision involved its vessel, the S/S Ogden Willamette, and the M/V Guarico, and was the fault of the latter vessel and its owner, defendant Compania Anonima Venezolana de Navegacion ("CAVN"). The complaint also acknowledges that CAVN is an agent or instrumentality of Venezuela within the meaning of the Foreign Sovereign Immunities Act of 1976 (the "Act"). 28 U.S.C. §§ 1330, 1602–11 (1976). Plaintiff served defendant with process according to the provisions of the Act.

CAVN responded with a counterclaim and third-party complaint that prayed for in rem process against plaintiff's vessel. CAVN agreed not to arrest the vessel after Willamette issued a $1.5 million bond as security for defendant's claims. Willamette then requested that CAVN post counter-security pursuant to Rule E(7) of the Supplemental Rules for Certain Maritime and Admiralty Claims of the Federal Rules of Civil Procedure. CAVN refused plaintiff's request, arguing that the provisions of the Act exempt it from having to post security.

Rule E(7) provides:

(7) Security on Counterclaim. Whenever there is asserted a counterclaim arising out of the same transaction or occurrence with respect to which the action was originally filed, and the defendant or claimant in the original action has given security to respond in damages, any plaintiff for whose benefit such security has been given shall give security in the usual amount and form to respond in damages to the claims set forth in such counterclaim, unless the court, for cause shown, shall otherwise direct; and proceedings on the original claim shall be stayed until such security is given, unless the court otherwise directs. When the United States or a corporate instrumentality thereof as defendant is relieved by law of the requirement of giving security to respond in damages it shall nevertheless be treated for the purposes of this subdivision E(7) as if it had given such security if a private person so situated would have been required to give it.

It is clear that instrumentalities of the United States are exempt from the requirement to post counter-security. 46 U.S.C. § 743 (1976). It is not so clear that it was the intention of the drafters of the Foreign Sovereign Immunities Act to similarly exempt the publicly-owned vessels of other nations.

CAVN argues that because the Act provides that the property of a foreign state is generally not subject to prejudgment attachment, see 28 U.S.C. §§ 1609, 1610 (1976), a foreign state should not be obliged to put up security before judgment. It is true that under the Act, a vessel belonging to the government of a foreign state cannot be arrested to enforce a maritime lien. 28 U.S.C. § 1605(b) (1976). But the purpose of counter-security is not to secure release for a vessel that might otherwise be attached in rem; it serves to create an "equality of security" between the litigants. See Geotas Compania de Vapores, S.A. v. S.S. Arie H., 237 F.Supp. 908, 910 (E.D.Pa.1964). Furthermore, an argument similar to defendant's was made on behalf of the United States in a case that arose before the Admiralty Act of 1920 expressly relieved the United States from the requirement to post counter-security. In The Gloria, 267 F. 929 (S.D.N.Y.1919), the United States brought suit and a counter-libel

was brought against it. Although United States vessels were exempt from attachment, the court ordered a stay of the United States' claim until it posted security. Judge Learned Hand, for the court, stated:

> The purpose of the rule [for stay], which is only to subject the original libelant to just conditions in the prosecution of his libel, cannot possibly be realized unless in such cases he be compelled to consent to give the same security which he would have had to give, had the cross-libelant been able to arrest the ship. This, of course, does not trench upon the libelant's immunity from process, if he have any, because the rule does not attempt to acquire jurisdiction over him at all . . . .

267 F. at 931.

Defendant also argues from the legislative history of the Act. Section 1605(b) denies immunity to foreign states for admiralty suits to enforce maritime liens arising out of commercial activity of the foreign state. The House report, discussing section 1605(b), states:

> The purpose of this subsection is [to] permit a plaintiff to bring suit in a U.S. district court arising out of a maritime lien involving a vessel or cargo of a foreign sovereign without arresting the vessel, by instituting an in personam action against the foreign state *in a manner analogous to bringing such a suit against the United States.* Cf. 46 U.S.C. 741, *et seq.*

H.R.Rep.No.94–1487, 94th Cong., 2nd Sess. 21, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6620 (emphasis added). CAVN takes this language to mean that when suits against foreign governments are permitted in admiralty under the Act, the defendant is granted "similar status" to the United States.

■ Yet, the operative word in the legislative history is "analogous". Congress never stated that admiralty suits against foreign sovereigns are to be treated in all respects like admiralty suits against the United States. No other language in the Act or in its legislative history even implies that it was Congress' intent to extend immunity from posting any bond in an admiralty proceeding to foreign sovereigns. *Cf.* 46 U.S.C. § 783 (1976) (United States shall not be required to post bond). In fact, the third general objective of the Act indicates that the narrow problem of seizure and attachment of foreign property to acquire jurisdiction was the focus of section 1605(b). (see appendix)

■ There is, in addition, a section of the Act that provides:

> As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable *in the same manner* and to the same extent as a private individual under like circumstances . . . .

28 U.S.C. § 1606 (1976) (emphasis added). Because CAVN is not entitled to immunity under section 1605 of the Act, and because a private individual would be required to post counter-security, CAVN must post security or have its counterclaim and third-party complaint stayed. CAVN having shown no cause under Rule E(7) why it should be otherwise exempted from having to post counter-security, plaintiff's motion is granted.

### APPENDIX

The opening pages of the legislative history of the Foreign Sovereign Immunities Act explain the aims Congress had in mind in drafting the Act:

> The bill, which has been drafted over many years and which has involved extensive consultations within the administration, among bar associations and in the academic community, would accomplish four objectives:
>
> First, the bill would codify the so-called "restrictive" principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis). This principle was

adopted by the Department of State in 1952 and has been followed by the courts and by the executive branch ever since. Moreover, it is regularly applied against the United States in suits against the U.S. Government in foreign courts.

Second, the bill would insure that this restrictive principle of immunity is applied in litigation before U.S. courts. At present, this is not always the case. Today, when a foreign state wishes to assert immunity, it will often request the Department of State to make a formal suggestion of immunity to the court. Although the State Department espouses the restrictive principle of immunity, the foreign state may attempt to bring diplomatic influences to bear upon the State Department's determination. A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process. . . .

Third, this bill would for the first time in U.S. law, provide a statutory procedure for making service upon and obtaining in personam jurisdiction over, a foreign state. This would render unnecessary the practice of seizing and attaching the property of a foreign government for the purpose of obtaining jurisdiction.

Fourth, the bill would remedy, in part, the present predicament of a plaintiff who has obtained a judgment against a foreign state. Under existing law, a foreign state in our courts enjoys absolute immunity from execution, even in ordinary commercial litigation where commercial assets are available for the satisfaction of a judgment. H.R. 11315 seeks to restrict this broad immunity from execution. It would conform the execution immunity rules more closely to the jurisdiction immunity rules. It would provide the judgment creditor some remedy if, after a reasonable period, a foreign state or its enterprise failed to satisfy a final judgment.

H.R.Rep.No.94–1487, 94th Cong., 2nd Sess. 7–8 *reprinted in* [1976] U.S.Code Cong. & Ad.News, pp. 6604, 6605–06.