69 F.3d 1226
 64 USLW 2315
 Don W. STEPHENS, Commissioner of Insurance of the
Commonwealth of Kentucky in his capacity as
Liquidator of Delta America Re Insurance
Company, Plaintiff-Appellant,
v.
NATIONAL DISTILLERS AND CHEMICAL CORPORATION, A Foreign
Corporation now known as Quantum Chemical Corporation;
Robert Edward Norton, an individual; John Francis
Salisbury; Hugh C. Brewer, III, an individual; Richard F.
Maynes, an individual; Terrence J. Reilly, an individual;
Ramsey E. Joslin, an individual; Roger W. Hill, Jr., an
individual; John C. Adlin, an individual; F. Donald
Brigham, an individual; Thomas W. Bullitt, an individual;
Leonard Briggs Marshall, an individual; Arion Insurance
Company, Ltd., A Foreign Corp.; Assubel Accidents Et
Dommages, A Foreign Corp.; Atlantica Cia National De
Seguros, A Foreign Corporation; Brasil Compania De Seguros,
A Foreign Corporation; Caisse Mutuelle D'Assurances Et De
Prevoyance, A Foreign Corporation; Ca De Seguros Orinoco, A
Foreign Corporation; CaJa National De Ahorro Y Seguro, A
Foreign Corporation; Canadian Union Insurance Company, A
Foreign Corporation; Central Reinsurance Corporation, A
Foreign Corporation; China Insurance Company, Ltd., also
known as Chung Kuo Insurance, A Foreign Corporation;
Chiyodafire & Marine Insurance Co. Ltd., A Foreign
Corporation; CIA Internacional De Seguros, A Foreign
Corporation; Compagnia De Assicurazioni Di Milano, A
Foreign Corporation; C.A. Reaseguradora Internacional Del
Orinoco, A Foreign Corporation; Compania Bandeirante De
Seguros Gerais, A Foreign Corporation; Folksamerica
Reinsurance Company, A Foreign Corporation; Fuji Fire &
Marine Insurance Co. Ltd., A Foreign Corporation; Hassneh
Insurance Co. of Israel, Ltd., A Foreign Corporation;
Insurance Company of the USSR. Ltd. (Ingosstrakh, Ssr,
Upravienie), A Foreign Corporation; Korean Reinsurance
Corporation, A Foreign Corporation; Kyoei Mutual Fire &
Marine Insurance Company, Ltd., A Foreign Corporation; La
Providence I.A.R.D. Groupe Presence, A Foreign Corporation;
Mingtai Fire & Marine Insurance Co., Ltd., A Foreign
Corporation; Messoghios Insurance Co., S.A., A Foreign
Corporation; Nippon Fire & Marine Insurance Company, Ltd.,
A Foreign Corporation; Overseas Union Insurance Limited, A
Foreign Corporation; Owens Insurance, Ltd, A Foreign
Corporation; Pan Korea Insurance Company, A Foreign
Corporation; Pohjola Insurance Company, Ltd., A Foreign
Corporation; Provident Assurance Co., A Foreign
Corporation; Ruhag Ruekver Herold Ruckverschening, A.G., A
Foreign Corporation; Seguros La Provincial, S.A., A Foreign
Corporation; Simcoe & Erie General Insurance Company, A
Foreign Corporation; SNL Insurance, Ltd., A Foreign
Corporation; Transport Industries Insurance Co., Ltd., A
Foreign Corporation; Toyo Fire & Marine Insurance Co.,
Ltd., A Foreign Corporation, Defendants,
Grupo De Empresas Seguradoras Brasileiras, A Foreign
Corporation; Instituto De Resseguros Do Brazil, A
Foreign Corporation, Defendants-Appellees.
 No. 717, Docket 93-7700.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 5, 1995.
Decided Nov. 3, 1995.
As Amended Jan. 11, 1996.
 
 W. Henry Jernigan, Jr., Lexington, KY (William F. Costigan, John P. McConnell, Costigan & Berns, P.C., New York, City on the brief), for Appellant.
 Larry W. Thomas, Cameron & Hornbostel, New York City (Gregory J. Bendlin, of counsel), for Appellee Grupo de Empresas Seguradoras Brasileiras.
 David S. Sheiffer, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Perry Kreidman, of counsel), for Appellee Instituto de Resseguros do Brazil, A Foreign Corporation.
 Before: MAHONEY, LEVAL, and CALABRESI, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 The Foreign Sovereign Immunities Act (FSIA),[1] "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States." H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610. The Supreme Court has described the FSIA as a "comprehensive set of legal standards," Verlinden B.V. v. Central Bank of Nig., 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983), preempting other laws purporting to set forth different rules for suits against foreign sovereigns. See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 437-38, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989).
 
 
 2
 The McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-1012, which "transformed the legal landscape by overturning the normal rules of preemption," United States Dep't of Treasury v. Fabe, --- U.S. ----, ----, 113 S.Ct. 2202, 2211, 124 L.Ed.2d 449 (1993), expresses an equally firm congressional intent to leave regulation of the insurance industry primarily to the states. The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. Sec. 1012(b).
 
 
 3
 In the case before us, we are asked to reconcile the demands of these seemingly inconsistent laws.
 
 BACKGROUND
 
 4
 Between 1974 and 1983, Delta America Re Insurance Company (Delta), a Kentucky reinsurance company with its principal place of business in New York, provided reinsurance on various property and casualty risks. Delta in turn obtained reinsurance on those risks from several other insurers, known in the insurance industry as retrocessionaires. Among those retrocessionaires were several foreign companies who claimed to be covered by sovereign immunity under the FSIA; they are the appellees in this dispute.
 
 
 5
 In 1986, Delta was declared insolvent. Appellant, the Commissioner of Insurance of the Commonwealth of Kentucky, who served as Liquidator for Delta, brought this action to recover balances allegedly due from the appellees and other retrocessionaires. The suit started in the Kentucky state courts and was removed to federal court by the appellees pursuant to 28 U.S.C. Sec. 1441(d) and Sec. 1603 (the FSIA). Initially, the District Court for the Eastern District of Kentucky remanded the matter to the state courts, but the appellees successfully appealed the jurisdictional question to the Court of Appeals for the Sixth Circuit. See In re Delta Am. Re Ins. Co., 900 F.2d 890 (6th Cir.), cert. denied sub. nom. Wright v. Arion Ins. Co., 498 U.S. 890, 111 S.Ct. 233, 112 L.Ed.2d 193 (1990). A prior motion to transfer venue to the Southern District of New York was then revived and granted under 28 U.S.C. Sec. 1404(a).
 
 
 6
 When the case arrived in the Southern District, the Liquidator demanded that the retrocessionaires post security to cover any potential judgment, as provided in New York Insurance Law Sec. 1213(c)(1)--which mandates that out-of-state insurers post security (or obtain a license) in order to be allowed to participate in court proceedings in New York.[2] The retrocessionaires moved to be relieved of the obligation to post security.
 
 
 7
 Magistrate Judge Kathleen A. Roberts recommended that all the retrocessionaires be required to post security, except for the appellees, whom she determined were foreign sovereign retrocessionaires. These foreign sovereign retrocessionaires were to be exempted from the security requirement because of the prohibition against attachments of foreign property found in Sec. 1609 of the FSIA. The Magistrate Judge's report rejected the Liquidator's claims (1) that the "pre-answer security" requirement of New York Insurance Law Sec. 1213(c)(1) was not an "attachment" and was therefore not covered by Sec. 1609 of the FSIA, and (2) that, even if it were, the McCarran-Ferguson Act precluded the application of the FSIA's bar in this context.
 
 
 8
 The appellants objected to the Magistrate Judge's Order and Opinion in the District Court. But the District Court (John S. Martin, Jr., Judge ) adopted the bulk of the report, and specifically the Magistrate Judge's determination that the foreign sovereign retrocessionaires were to be free from the state-law security requirement.[3]
 
 
 9
 On appeal, the Liquidator contests those components of the Magistrate Judge's report (as adopted by the District Court) that found (1) that the security requirement was a prohibited "attachment" under Sec. 1609 of the FSIA, and (2) that the McCarran-Ferguson Act did not preclude application of the FSIA.
 
 
 10
 IS Sec. 1213 AN ATTACHMENT?
 
 
 11
 Passed by Congress in 1976, the FSIA governs all "claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." Verlinden, 461 U.S. at 488, 103 S.Ct. at 1968. Among the provisions defining the contours for permissible actions against foreign sovereigns, Sec. 1609 of the FSIA states:
 
 
 12
 Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.
 
 
 13
 Since the exceptions in Secs. 1610-1611 are not applicable in this context, and no international agreement is at issue, the initial dispute about the applicability of this provision of the FSIA turns on whether New York's prejudgment security constitutes a forbidden "attachment" of the appellees' property.
 
 
 14
 The Magistrate Judge, relying heavily on this court's decision in S & S Machinery Co. v. Masinexportimport, 706 F.2d 411, 418 (2d Cir.) (dissolving an injunction that prohibited the negotiation of letters of credit by a foreign sovereign), cert. denied, 464 U.S. 850, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983), held that the pre-answer security requirement is an attachment. In S & S Machinery we explained that the "FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property," and we indicated that the FSIA's ban on pre-judgment attachment of assets should preclude "any other means to effect the same result." Id.; see also Caribbean Trading & Fidelity Corp., 948 F.2d at 116 (Mahoney, J., concurring). The pre-judgment security requirement before us would force foreign sovereign retrocessionaires to place some of their assets in the hands of the United States courts for an indefinite period. During that time, the retrocessionaires would have no access to those assets. All this is precisely the same result that would obtain if the foreign sovereign's assets were formally attached. There is, therefore, no significant distinction between New York's security requirement and an attachment of the property.
 
 
 15
 In arguing that the requirement on foreign sovereigns to pay certain funds claimed to be owing pending the resolution of litigation may not be an attachment for purposes of the FSIA, the Liquidator relies on three cases. The first two: Bowers v. Transportes Navieros Ecuadorianos (Transnave), 719 F.Supp. 166, 171-72 (S.D.N.Y.1989) (interim liability payments authorized by statute pending a final resolution on the merits "will not restrain the use or transfer of any of [the foreign sovereign's] property in this country" and thus are not barred by Sec. 1609), and Willamette Transport, Inc. v. Cia. Anonima Venezolana de Navegacion, 491 F.Supp. 442, 443-44 (E.D.La.1980) (Sec. 1609 does not allow a foreign sovereign to avoid posting a counter-security in an admiralty action), are district court cases. And we are not persuaded, especially in view of their rather specialized circumstances, that they justify a reconsideration of what is clearly the thrust, if not the holding, of S & S Machinery.
 
 
 16
 More significant for the appellants' argument is Sperry International Trade, Inc. v. Government of Israel, 689 F.2d 301, 305-06 n. 7 (2d Cir.1982), in which this court, in a footnote and without discussion, rejected the contention that an interim arbitral award directing that certain proceeds be held in escrow pending a final determination violated Sec. 1609. In Sperry we held that the award was "an in personam order, not an attachment order of the sort forbidden by Sec. 1609," id., but we did not provide any further explanation of this distinction. Using Sperry as a jumping off point, the Liquidator seeks to distinguish between an attachment--which burdens a piece of property regardless of the relationship of that property to the litigation--and the pre-judgment security here at issue--which serves as an enforcement mechanism for the collection of judgments in New York courts by requiring a litigant to provide security for any judgment that might be rendered against it.
 
 
 17
 Neither Sperry nor the FSIA, however, makes this distinction. Rather, the FSIA forbids any "attachment[,] arrest or execution" of a foreign sovereign's property subject only to the exceptions set forth in Secs. 1610-1611. And we are not at liberty to create other exceptions, not in the statute. We ought not, moreover, readily ignore our conclusion in S & S Machinery--which postdated Sperry--that the principle behind the prohibition against attachments should apply broadly. For, as we noted in that case, "such a measure could only ... result[ ] in the disingenuous flouting of the FSIA ban on prejudgment attachment of assets." S & S Machinery, 706 F.2d at 418.
 
 
 18
 It follows that the FSIA, if it does apply in this context--a question we will address below--exempts the foreign sovereign retrocessionaires from the pre-judgment security requirements of state laws like that established by N.Y. Ins. Law Sec. 1213(c)(1)(A).
 
 
 19
 THE INTERACTION BETWEEN THE MCCARRAN-FERGUSON ACT AND THE FSIA
 
 
 20
 The precise meaning and scope of the McCarran-Ferguson Act have been the subject of debate since its passage in 1946. For many years, the statute was interpreted as doing no more than reversing the Supreme Court's decision in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), in which the Court held that insurance transactions across state lines involved interstate commerce and were thus subject to federal regulation under the Commerce Clause. See, e.g., SEC v. National Securities, Inc., 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) (calling the McCarran-Ferguson Act an "attempt to turn back the clock" after South-Eastern Underwriters ). In United States Department of Treasury v. Fabe, --- U.S. ----, ----, 113 S.Ct. 2202, 2211, 124 L.Ed.2d 449 (1993), however, the Supreme Court explicitly rejected this view, and stated that the McCarran-Ferguson Act "did not simply overrule South-Eastern Underwriters and restore the status quo," but instead that it
 
 
 21
 transformed the legal landscape by overturning the normal rules of preemption. Ordinarily, a federal law supersedes any inconsistent state law. The first clause of Sec. [1012(b) ] reverses this by imposing what is, in effect, a clear-statement rule, a rule that state laws enacted "for the purpose of regulating the business of insurance" do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise.
 
 
 22
 But even this powerful and broad statement leaves some uncertainties as to the reach of the McCarran-Ferguson Act. It is possible to read the McCarran-Ferguson Act to mean that whenever there exists a state law that regulates the business of insurance, no federal law can be applied "to invalidate, impair, or supersede" that state law, unless that federal law "specifically relates to the business of insurance." See 15 U.S.C. Sec. 1012(b). Such an understanding of the McCarran-Ferguson Act, which is of course advocated by the Liquidator, would seem to preclude the application of the FSIA's prohibition on attachments here, since the parties do not dispute (1) that the state-law security requirement here regulates the business of insurance, (2) that the FSIA's prohibition on attachments operates "to invalidate, impair, or supersede" the state law security requirement, and (3) the FSIA does not specifically relate to the business of insurance.
 
 
 23
 We nonetheless conclude that the McCarran-Ferguson Act does not preclude the preempting of New York's pre-judgment security requirement. The Supreme Court's language in Fabe in no way compels such a broad reading of the McCarran-Ferguson Act, while prior case law in this Court, at the very least, recommends a narrower reading of the statute. More important, the international-law origins of the FSIA, so different from the kind of congressional statutory action that the McCarran-Ferguson Act was enacted to deal with, virtually compel the conclusion that the McCarran-Ferguson Act should not be interpreted to exclude insurance companies from the FSIA's requirements of sovereign immunity.
 
 
 24
 In holding that the FSIA preempts the McCarran-Ferguson Act, we do not, however, rely on the decision of the Magistrate Judge. The Magistrate Judge, whose opinion came down before Fabe was decided, based her determination that the McCarran-Ferguson Act did not apply in this context on an earlier Supreme Court decision, which she read to hold that the McCarran-Ferguson Act only "exempts the insurance industry from Commerce Clause restrictions." Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 880, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985). Because "Congress expressly exercised its power to regulate foreign commerce, along with other specified Art. I powers" in enacting the FSIA, Verlinden, 461 U.S. at 496, 103 S.Ct. at 1973 (emphasis added), the Magistrate Judge found that the preemptive effect of the McCarran-Ferguson Act did not apply to it. Appellees argue that, even though the advent of Fabe precludes the narrowest readings of the McCarran-Ferguson Act, Fabe did not undercut the Supreme Court's holding in Metropolitan Life Insurance. As a result, they assert, the Magistrate Judge's decision that the McCarran-Ferguson Act applies only to federal legislation passed pursuant to Congress' Commerce Clause authority can still stand.[4] But, while Fabe does not overturn Metropolitan Life, Fabe's holding is not easily consistent with such a restrictive view of the McCarran-Ferguson Act.[5]
 
 
 25
 Rather than adopting the Magistrate Judge's pre-Fabe ruling, we conclude that the McCarran-Ferguson Act does not apply in this case for two other reasons. First, this court's decision in Spirt v. Teachers Insurance & Annuity Association, 691 F.2d 1054 (2d Cir.1982), cert. granted and judgment vacated and remanded on other grounds as modified by 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), reinstated as modified on other grounds by 735 F.2d 23 (2d Cir.), cert. denied, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984), suggests limitations on the McCarran-Ferguson Act that would make the statute inapplicable to the FSIA. In Spirt, we were faced with a claim that an insurance company was exempt from the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e et seq., by virtue of the McCarran-Ferguson Act. We held, instead, that
 
 
 26
 [t]he [McCarran-Ferguson Act] was never meant to prevent, and could not prevent, Congress from explicitly imposing requirements on employers and their agents under the civil rights statutes, the National Labor Relations Act, or any other statute that seeks to enforce compliance with federal policies in such fields as civil rights, labor and other areas of national concern.
 
 
 27
 Spirt, 691 F.2d at 1066. Our decision placed great emphasis on the fact that the Court was not being asked to construe Title VII "implicitly [to] pre-empt state laws," because Title VII "contains a broad and explicit pre-emptive provision," id. at 1065 (emphasis in original). In saying this, we were clearly referring to the legislative history of the McCarran-Ferguson Act, for, as one member of Congress noted: under the McCarran-Ferguson Act "no existing law and no future law should, by mere implication, be applied to the business of insurance," 91 Cong.Rec. 1487 (daily ed. Feb. 27, 1945) (Statement of Sen. O'Mahoney), quoted in Fabe, --- U.S. at ---- n. 7, 113 S.Ct. at 2211 n. 7 (emphasis added).
 
 
 28
 The Supreme Court, like every circuit that has considered the question, has read the FSIA as providing the exclusive means for suing a foreign state, and thus as preempting all other laws purporting to set forth rules for suits against foreign sovereigns. See, e.g., Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 437-38, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989); Gates v. Victor Fine Foods, 54 F.3d 1457, 1459 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 187, --- L.Ed.2d ---- (1995); Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1017 (2d Cir.1991); Forsythe v. Saudi Arabian Airlines Corp., 885 F.2d 285, 288 (5th Cir.1989) (per curiam); Hercaire Int'l, Inc. v. Argentina, 821 F.2d 559, 563 (11th Cir.1987); Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 372 (7th Cir.1985) (per curiam); Williams v. Shipping Corp. of India, 653 F.2d 875, 878-79 (4th Cir.1981), cert. denied, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). The FSIA's language, moreover, supports the interpretation that it means to preempt state law. See, e.g., 28 U.S.C. Sec. 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter."); id. Sec. 1604 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."). And the preemptive intent of this language is confirmed by the report of the House Judiciary Committee on the FSIA, which states that the statute "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity," and "to preempt any other State or Federal law ... for according immunity to foreign governments." 1976 U.S.C.C.A.N. at 6610.
 
 
 29
 In Spirt, we emphasized the importance of civil rights laws, and noted that it would defy common sense and congressional policy to exempt the insurance industry from their reach. See 691 F.2d at 1065-66. The FSIA reflects an equally important national concern--foreign policy. As the Supreme Court has noted:
 
 
 30
 By reason of its authority over foreign commerce and foreign relations, Congress has the undisputed power to decide, as a matter of federal law, whether and under what circumstances foreign nations should be amenable to suit in the United States. Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States, and the primacy of federal concerns is evident.
 
 
 31
 Verlinden, 461 U.S. at 493, 103 S.Ct. at 1971.
 
 
 32
 Our precedent in Spirt requires us to apply federal law to the insurance industry, in spite of the McCarran-Ferguson Act, whenever federal law clearly intends to displace all state laws to the contrary. The Supreme Court, in Fabe, has not ruled otherwise. The normal rules of preemption--which would require us to apply federal law in the face of a conflict between state and federal law even where the federal law does not explicitly manifest an intent to be preemptive--were altered by the passage of the McCarran-Ferguson Act. That is the essence of Fabe's holding. But these rules were not altered so drastically as to force a federal law that clearly intends to preempt all other state laws to give way simply because the insurance industry is involved.[6]
 
 
 33
 There is, moreover, a second and overriding consideration that requires us to refuse to apply the McCarran-Ferguson Act so as to thwart the FSIA prohibition against attachment of the property of a foreign sovereign. When the McCarran-Ferguson Act was enacted in 1946, the United States accorded foreign sovereigns absolute immunity from suit in United States courts. See, e.g., Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen, 43 F.2d 705, 710 (2d Cir.1930) (surveying international law on sovereign immunity and noting that "[s]uch weight of international authority should be respected as establishing the common consent of civilized nations in the formation of the international rule of law"), cert. denied, 282 U.S. 896, 51 S.Ct. 181, 75 L.Ed. 789 (1931); see also The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812) (establishing the rule of absolute sovereign immunity). Parallel to this immunity from suit was an absolute immunity from attachment of the property of foreign sovereigns located in this country. See 1976 U.S.C.C.A.N. at 6626 ("[T]he traditional view in the United States concerning execution has been that the property of foreign states is absolutely immune from execution.").
 
 
 34
 In 1952, the State Department followed a growing trend in international law and modified the former policy of total immunity. It adopted instead a policy of restrictive immunity, which prevented foreign sovereigns from being sued for their public actions but allowed suit against foreign states when they were acting as private, commercial actors. See 26 Dep't of State Bull. 984-85 (1952). This new policy of restrictive immunity, set forth in a letter from Jack B. Tate, Acting Legal Adviser of the State Department, to Acting Attorney General Philip B. Perlman (known as the Tate Letter),[7] was not extended to cases involving the attachment of property. See, e.g., New York & Cuba Mail S.S. Co. v. Republic of Korea, 132 F.Supp. 684, 685 (S.D.N.Y.1955). The only exception to this rule was that attachment could sometimes be allowed in order to obtain jurisdiction over the foreign entity. And even this exception was generally recognized as irrelevant to the issue before us, since attachment to obtain jurisdiction still could not be used to secure any judgment that might result. See Andreas F. Lowenfeld, Claims Against Foreign States--A Proposal for Reform of United States Law, 44 N.Y.U.L.Rev. 901, 908-09, 923-24 (1969); see also Mark C. Del Bianco, Execution and Attachment Under the Foreign Sovereign Immunities Act of 1976, 5 Yale Stud.World Pub.Ord. 109, 111 (1979).
 
 
 35
 These rules were historically controlled by the executive branch instead of the courts, as "[c]ourts ha[d] generally considered that sovereign immunity was a political or diplomatic problem, more than a legal one, and ha[d] deferred to the State Department's judgment in these cases." Ocean Transport Co. v. Government of the Republic of the Ivory Coast, 269 F.Supp. 703, 705 (E.D.La.1967); see also National City Bank of N.Y. v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). The FSIA was enacted not so much to change the rules as to "transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process." 1976 U.S.C.C.A.N. at 6606. In transferring this responsibility, the FSIA was primarily codifying pre-existing international and federal common law. Most important for the issue before us, the basic rules relating to pre-judgment attachment to secure a judgment were unchanged by the passage of the FSIA. See Del Bianco, supra, at 111-13.
 
 
 36
 Prior to the enactment of the FSIA, then, a foreign sovereign retrocessionaire would have been exempt from the requirements of New York Insurance Law Sec. 1213(c)(1) because of the international law rule, accepted by federal common law, that the property of foreign sovereigns was absolutely immune from attachment. The FSIA did not alter that rule, other than to create the exceptions contained in Secs. 1610-1611. The McCarran-Ferguson Act, by its plain terms, provides that "[n]o act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. Sec. 1012(b) (emphasis added). But it was not an "act of Congress" that superseded New York insurance law. International law, accepted by federal common law, had already done that before the FSIA came into being. And the McCarran-Ferguson Act did not by its terms or in its history purport to overturn any pre-existing international or common law. To bring the McCarran-Ferguson Act into play simply because Congress chose to codify that pre-existing law would truly defy common sense.
 
 CONCLUSION
 
 37
 The Supreme Court in Fabe described the McCarran-Ferguson Act as "imposing what is, in effect, a clear-statement rule," --- U.S. at ----, 113 S.Ct. at 2211. The McCarran-Ferguson Act, as read in Fabe, requires Congress, in enacting new legislation, to consider whether that legislation should apply to the insurance industry, and to state clearly if it should. See also NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 294-95 (7th Cir.1992) ("Congress did not tie its hands; instead it prescribed the consequences of silence and specificity in other acts past and future. Federal laws that do not conflict with or supersede state rules always apply; federal laws inconsistent with state laws apply when Congress says so directly."), cert. denied, --- U.S. ----, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993).
 
 
 38
 Fair enough. But since neither the language nor the history of the McCarran-Ferguson Act suggest it, we should not read the McCarran-Ferguson Act to require a clear congressional statement of intent to preempt, when that preemption had already occurred through operation of pre-existing, non-statutory law. In such situations, it is not the codifying "act of Congress" that preempts state law; it is rather the underlying common law--which the McCarran-Ferguson Act does not purport to deal with--that accomplishes the preemption.
 
 
 39
 What the Liquidator sought to do through operation of New York Insurance Law Sec. 1213(c)(1) was the equivalent of an attachment of the assets of the foreign sovereign retrocessionaires. Such an attachment is forbidden by international law, adopted into federal common law and subsequently codified by the FSIA. Nothing in the McCarran-Ferguson Act alters that. Accordingly, the judgment of the district court is affirmed.
 
 
 
 [1]
 Pub.L. 94-583, 90 Stat. 2898 (1976), codified at 28 U.S.C. Secs. 1330(a), 1441(d), 1602-1611
 
 
 [2]
 N.Y.Ins.Law Sec. 1213(c)(1) (McKinney's 1985) specifically provides:
 Before any unauthorized foreign or alien insurer files any pleading in any proceeding against it, it shall either:
 (A) deposit with the clerk of the court in which the proceeding is pending, cash or securities or file with such clerk a bond with good and sufficient sureties ... in an amount to be fixed by the court sufficient to secure payment of any final judgment which may be rendered in the proceeding....
 (B) procure a license to do an insurance business in this state.
 State law pertaining to processes for securing the satisfaction of judgments is applicable through Fed.R.Civ.P. 64.
 
 
 [3]
 The District Court found that Kentucky's law pertaining to the posting of security, Ky.Rev.Stat. Sec. 304.11-040(7)(a) (1970 & Supp.1994), rather than New York's law, was applicable in this action. The court concluded, however, that Kentucky law would also require the retrocessionaires to post security in order to participate in the proceeding. The briefs by all of the parties in this Court essentially ignore Judge Martin's determination that Kentucky law should apply. And this point only surfaces when appellee Grupo de Empresas Seguradoras Brasileiras ("GESB") half-heartedly claims that the decision below is just a choice-of-law determination, which we have no jurisdiction to review. The Liquidator responds first by properly noting that a decision denying security is an appealable collateral order, see Caribbean Trading & Fidelity Corp. v. Nigerian Nat'l Petroleum Corp., 948 F.2d 111, 113-14 (2d Cir.1991), cert. denied, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992), and then by claiming that the District Court held that Kentucky's security-posting law was for all relevant purposes identical to New York's law
 The District Court never explicitly held that Kentucky's law and New York's law were identical. However, since application of Kentucky law would require the retrocessionaires to post security, similar to that required by New York law, the question presented to this Court is the same whichever law applies. Because the parties repeatedly refer to N.Y.Ins.Law Sec. 1213(c)(1) and its specific provisions as if it were the state statute at issue in this dispute and because the precise origin of the prejudgment security requirement does not affect our decision, we will make reference to the New York statute in considering the problem.
 
 
 [4]
 Appellees further argue that the Court in Fabe explicitly limited its holding to the facts of the case before it. While it is true that the Court stated that "[b]y this decision, we rule only upon the clash of priorities as pronounced by the respective provisions of the federal statute and the Ohio Code," Fabe, --- U.S. at ----, 113 S.Ct. at 2212, we cannot ignore the Court's analysis of the McCarran-Ferguson Act, which clearly extends beyond the narrow question presented to it
 
 
 [5]
 Metropolitan Life Insurance does not itself support the proposition that only Commerce Clause legislation is subject to the McCarran-Ferguson Act. What that decision holds is simply that state insurance legislation is exempt from the restrictions of the Dormant Commerce Clause as a result of the McCarran-Ferguson Act, but that insurance laws still must comply with the constitutional requirements of the Equal Protection Clause. See 470 U.S. at 880-882, 105 S.Ct. at 1682-1684; see also State Bd. of Ins. v. Todd Shipyards Corp., 370 U.S. 451, 454-457, 82 S.Ct. 1380, 1382-1384, 8 L.Ed.2d 620 (1962) (states must comply with the requirements of the Due Process Clause when enacting insurance laws)
 The fact that Fabe did not expressly reject a view of the McCarran-Ferguson Act that would limit its reach to legislation passed pursuant to the Commerce Clause should, however, caution us not to overextend Fabe's reach. And there is some indication in the legislative history of the McCarran-Ferguson Act that it was intended to apply only to Commerce Clause legislation. For example, Senator Ferguson, discussing the purpose of the Act, stated that: "What we have in mind is that the insurance business, being interstate commerce, if we merely enact a law relating to interstate commerce, or if there is a law now on the statute books relating in some way to interstate commerce, it would not apply to insurance." 91 Cong.Rec. 1487 (daily ed. Feb. 27, 1945) (Statement of Sen. Ferguson), quoted in Fabe, --- U.S. at ----, 113 S.Ct. at 2211. But since we hold, on other grounds, that the McCarran-Ferguson Act does not apply in the case before us, we need not decide whether the statute is limited to Commerce Clause legislation.
 
 
 [6]
 Coincidentally with this case, another panel of this Court ruled in Stephens v. American International Ins. Co., 66 F.3d 41 (2d Cir.1995) that the McCarran-Ferguson Act prohibited the application of the Federal Arbitration Act (FAA) in a manner that would preempt a Kentucky insurance law. Because the decision in the case before us is fully supported by the fact that international law preempted the relevant state insurance law before the passage of both the McCarran-Ferguson Act and the FSIA, see infra, we need not consider whether the alternative ground discussed above is in conflict with the holding of American Distillers
 
 
 [7]
 The history and impact of the Tate Letter, and more generally of Jack Tate's legal influence is eloquently discussed in Sugarman v. Aeromexico, Inc., 626 F.2d 270, 273-75 & n. 8 (3d Cir.1980) (Pollak, J.)