In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-1254

DELBERT L. DUNMIRE,

*Plaintiff-Appellant,*

*v.*

LAWRENCE J. SCHNEIDER,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 3450—**John A. Nordberg**, *Judge.*

———————

ARGUED FEBRUARY 5, 2007—DECIDED MARCH 15, 2007

———————

Before EASTERBROOK, *Chief Judge*, and ROVNER and
SYKES, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Delbert Dunmire traded
silver futures contracts through Morgan Stanley and
its predecessor Dean Witter. Dunmire's broker, John
Hoffman, retired in 2002 and Morgan Stanley assigned
the account to his son Matt. Lawrence Schneider, a
supervisory broker, assured Dunmire that Matt was up
to the task and promised to keep tabs on his performance.
In April 2004 volatility in the silver market led the New
York Mercantile Exchange, where Dunmire's contracts
were trading, to increase its maintenance margin require-
ments. Matt Hoffman miscalculated the effects of this
change and told Dunmire that he needed $750,000 in

additional margin, about one-quarter of what actually was required; Dunmire posted the $750,000 to maintain his contracts, though he might not have done so had Hoffman provided accurate numbers.

On April 19, 2004, Hoffman told Dunmire that $1 million in additional margin was needed before the market opened the next day. Again Hoffman's calculation was off (the actual requirement was more than $3 million), but Dunmire decided that even an extra $1 million was too much to put at risk. He declined to meet this margin call, expecting that his position would be liquidated immediately. Yet liquidation did not occur on the 20th—whether because the market went limit down that morning or because Hoffman made still another error is unclear. By the time Dunmire's positions were closed the afternoon of April 21, his silver contracts had a negative value. Morgan Stanley demanded $1.4 million to cover the loss; Dunmire, however, demanded that Morgan Stanley pay about $2 million to make good what Dunmire thought to be the consequences of Hoffman's blunders. A stalemate was followed by litigation—and still more litigation.

Dunmire first launched a reparations proceeding before the Commodities Futures Trading Commission seeking $2 million. See 7 U.S.C. §§ 9, 18. Morgan Stanley filed a counterclaim seeking $1.4 million. While that was pending, Dunmire sued Morgan Stanley in the Western District of Missouri on the theory that it had disclosed confidential information to his estranged wife, in violation of federal laws regulating financial transactions. Next Dunmire commenced an arbitration before the National Futures Association; again Morgan Stanley counterclaimed for the balance due on the account. Dunmire's fourth action, against Matt Hoffman, was filed in the Southern District of New York. His fifth, against Robert Lee, one of Hoffman's co-workers, was filed in the Western District of Missouri. And his sixth, this suit, was filed

against Schneider in the Northern District of Illinois. This is the sort of vexatious multiplication that 28 U.S.C. §1927 is designed to prevent, though Schneider has not invoked that statute in this suit.

The main event was (or should have been) the National Futures Association, whose arbitrators split the difference by rejecting both Dunmire's demand for $2 million in damages and Morgan Stanley's demand for the $1.4 million shortfall. The suit against Lee was dismissed for lack of personal jurisdiction. The reparations proceeding was dismissed on Dunmire's motion after it had been pending for more than a year—and the CFTC concluded that Dunmire's effort to recover in the administrative forum without showing *scienter* on Morgan Stanley's part was frivolous, so that Morgan Stanley's counterclaim had to be dismissed for lack of jurisdiction. *Dunmire v. Hoffman*, 2006 CFTC LEXIS 25 (Mar. 2, 2006). Morgan Stanley won the wrongful-disclosure suit on the merits. See *Dunmire v. Morgan Stanley DW, Inc.*, 2007 U.S. App. LEXIS 2474 (8th Cir. Feb. 5, 2007). Finally, the actions against Hoffman and Schneider were dismissed as barred by Dunmire's promise to arbitrate rather than litigate.

The "Futures Customer Agreement" between Dunmire and Morgan Stanley contains this arbitration clause:

> Every dispute between customer and [Morgan Stanley] arising out of or relating to the making or performance of this Agreement or any transaction pursuant to this Agreement, shall be settled by arbitration in accordance with the rules, then in effect, of the National Futures Association, the contract market upon which the transaction giving rise to the claim was executed, or the National Association of Securities Dealers, as Customer may elect. . . . By signing this agreement you (1) may be waiving your right to sue in a court of law

and (2) are agreeing to be bound by arbitration of any claims or counterclaims which you or [Morgan Stanley] may submit to arbitration under this agreement.

Dunmire observes that this clause does not mention Morgan Stanley's employees, and he insists that he is therefore free to sue Schneider in any court where he can obtain personal jurisdiction. The district court, by contrast, observed that Dunmire's dispute with Schneider is one "arising out of or relating to the making or performance of this Agreement or any transaction pursuant to this Agreement"; Dunmire's claims concern how Schneider supervised (or didn't supervise) Hoffman's handling of his account, rather than an unrelated topic such as negligence while driving a car.

Morgan Stanley's obligations to Dunmire depend on what its agents did (or omitted) when dealing with his account. It would make little sense for a customer to arbitrate Morgan Stanley's liability while simultaneously litigating with the employees—if there were anything to litigate with the employees *about*. Schneider, Hoffman, and Lee dealt with Dunmire on behalf of a disclosed principal; as long as they acted within the scope of that agency, they would not be personally liable under the law of most states whether or not their errors or omissions caused Morgan Stanley to injure a customer. See *Restatement (Third) of Agency* §6.01 & Comment d (2006). (This contrasts with torts, for which an agent may be directly liable. See *id*. at §7.01.) Given the rule that liability runs for or against the principal only, a contract providing for arbitration between the customer and the principal covers the waterfront.

To the extent that there is any doubt about this, courts regularly treat employees as third-party beneficiaries of arbitration clauses such as this. See *Letizia v. Prudential*

*Bache Securities, Inc.*, 802 F.2d 1185 (9th Cir. 1986), approved (though in dictum) in *Asset Allocation & Management Co. v. Western Employers Insurance Co.*, 892 F.2d 566, 574-75 (7th Cir. 1989). See also, e.g., *Pritzker v. Merrill Lynch, Pearce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993). No appellate decision goes the other way.

The benefits of arbitration in making decision fast and less expensive, and committing resolution to experts, can be achieved only by consolidating all claims and theories in a single arbitral forum. Should any of its employees be held liable in separate litigation, Morgan Stanley would have to pay; Morgan Stanley also is bearing the legal expense of defending the suits. (Morgan Stanley's internal counsel's office is representing Schneider.) Cf. *Ross v. American Express Co.*, 2007 U.S. App. LEXIS 3224 (2d Cir. Feb. 13, 2007) (it would be unjust to allow a person who has agreed to arbitrate a dispute to weasel out of that promise by suing related persons or entities, so equitable estoppel blocks such a course).

Arbitration is a creature of contract, as Dunmire stresses, but the party to be bound here is Dunmire himself: his signature is on the contract. That Schneider and Morgan Stanley's other employees did not sign does not distinguish this from any other situation in which the signatories to a contract confer benefits on third parties. Dunmire could acquire services from Morgan Stanley at lower cost by agreeing to arbitrate all claims in one forum than he could by threatening suits against all of Morgan Stanley's employees, one at a time, and obtaining judgments that Morgan Stanley must pay. Dunmire is trying to roll the dice repeatedly and take the outcome most favorable to him; that skews the odds compared with a single arbitration (or for that matter a single litigation)

and imposes on dealers a cost that investors must bear in the end.

Notwithstanding all of this, Dunmire insists, his situation is distinctive because Morgan Stanley changed the terms of the arbitration clause. Until 2000 arbitration agreements between Morgan Stanley and its customers specifically covered claims against the firm's employees as well. That language was dropped in 2000, and the difference implies that the arbitration clause no longer covers employees, the argument runs.

An inference from a change in language is weak. Good drafters often omit unnecessary language, which complicates agreements and impedes comprehension without changing the consequences. Given decisions such as *Asset Allocation, Letizia, Pritzker*, and *Roby*, all of which pre-dated 2000, a reference to employees could well have been omitted as pointless clutter.

As it happens, however, there was no change. Dunmire's appellate lawyer either does not understand the agreements her client signed or is attempting to mislead the court. Dunmire signed four agreements with Morgan Stanley and its predecessor in interest. Two dealt with securities and two with futures and other derivatives. The four are, in order of signing: (1) a "Customer Agreement: Margin Account" (1989); (2) a "Futures Customer Agreement" (1997); (3) a "Client Account Agreement" (1999); and (4) a "Futures Customer Agreement" (2000). Numbers 1 and 3 deal with securities, numbers 2 and 4 with derivatives. Dunmire's appellate lawyer compares agreements 3 and 4, observing that the former consents to arbitration by and against employees while the latter does not mention employees. Yet agreement 4 did not replace agreement 3; it replaced agreement 2. Both agreements 1 and 3 specify that arbitration includes claims by and against employees; neither agreement 2 nor agreement 4 mentions

employees. So there has been no change on either the securities side or the derivatives side. The difference probably can be traced to the fact that the securities clause is a standard form used by NASD, while the derivatives clause is common for futures transactions. No matter why the securities agreement differs from the derivatives agreement, however, there has been no material change with respect to either line of business, and no inference can be drawn from nonexistent change.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*