In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 12-2308 & 12-2623

JOHNSON CONTROLS, INC.,

*Plaintiff-Appellant*,

*v.*

EDMAN CONTROLS, INC.,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 11-cv-00928—**Lynn Adelman**, *Judge.*

ARGUED OCTOBER 24, 2012—DECIDED MARCH 18, 2013

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Although arbitration is supposed to be a procedure through which a dispute can be resolved privately, with the narrowest of exceptions for court intervention, losers sometimes cannot resist the urge to try for a second bite at the apple. That is what has happened here. Johnson Controls, Inc. (Johnson) and Edman Controls, Inc. (Edman) entered into an agreement giving Edman the exclusive rights to distribute

Johnson's products in Panama. When it appeared that Johnson was not living up to its promise, Edman invoked the agreement's arbitration clause. The arbitrator ultimately concluded that Johnson had breached the agreement and that Edman was entitled to damages. Rather than accept that result, Johnson filed this suit, in which it seeks to vacate or modify the arbitral award. Edman responded with a motion to confirm. The district court ruled in Edman's favor, and Johnson now appeals.

# I

Johnson is a Wisconsin company that manufactures building management systems and HVAC equipment. It distributes its products through direct sales, mechanical contractors, and distributors. Edman, a distribution company, was created by a former employee of Johnson; it is incorporated in the British Virgin Islands. Edman hoped to exploit its familiarity with the Panamanian building market in order to market Johnson's products to developers there.

In March 2007, Johnson and Edman entered into an agreement that awarded Edman the exclusive rights to distribute Johnson products in Panama. The agreement committed Johnson to assist Edman with semi-annual reviews of a market focus plan and to give Edman marketing and sales information, including specific customer leads. The agreement also provided that any dispute arising from the parties' arrangement would be resolved through arbitration using Wisconsin law and

that the losing party would be responsible for the pre-vailing party's attorneys' fees. After the agreement was concluded, Johnson distributed promotional materials recognizing Edman as the "only authorized fire safety, CCTV, and access control agent for [Johnson] in Panama."

At the time the parties signed the agreement, Johnson was aware that Edman planned to distribute Johnson's products by contracting with its two Panamanian subsidiary corporations, Pinnacle Technologies and Pinnacle Engineering—we refer to them as "Pinnacle" for simplicity. (They were merged into Edman on July 28, 2011, but this is of no importance to the dispute here.) Edman's plan was to delegate to Pinnacle the direct responsibility to deliver Johnson's products to Panamanian customers. Edman itself would operate as an intermediary between Johnson and Pinnacle.

In 2009, Johnson breached the agreement by attempting to sell its products directly to Panamanian developers, circumventing Edman. There was nothing subtle about this: Johnson supervisors instructed managers of Johnson's operations in Latin America to "keep Edman away from Johnson." The head of Johnson's Latin American operations in Panama confirmed that he understood he was not to deal with Edman's president. As of mid-2009, Edman said, it had lost all support and backing from Johnson. Edman representatives repeatedly emailed Johnson about the issue, but they never received a response. In 2010, Edman learned that Johnson was offering to sell its products directly to Edman's primary client in Panama—a building developer

that had purchased Johnson products from Edman for numerous projects on the understanding that Edman was the exclusive Johnson distributor in Panama. This client lost trust in Edman because it felt that Edman had misrepresented its exclusive right to distribute Johnson products. Once Johnson began to present itself as Edman's competitor, customers started questioning whether Edman could still support the Johnson products it sold.

In August 2010, Edman initiated arbitration proceedings against Johnson, raising four claims: (1) tortious interference with Edman's contractual relations with its customers; (2) unjust enrichment; (3) breach of duties of good faith and fair dealing arising out of the contract; and (4) tortious interference with Pinnacle's contractual relations. The arbitrator dismissed Edman's fourth claim on the ground that he was not authorized to address matters concerning "relationships enjoyed by either of Edman's subsidiary corporations." Nevertheless, he concluded that Edman had suffered its own damages, independent of whatever damage Pinnacle suffered. While Johnson has attacked this conclusion vigorously in this court, it does not strike us as contradictory or baseless. Edman entered into the agreement for the purpose of profiting from distributing Johnson products. It chose to accomplish this task by using its Panamanian subsidiaries as its agents, rather than using in-house employees or third-party agents. This was not a charitable operation; Edman naturally expected to profit from its overall efforts. Moreover, as the arbitrator pointed out, Johnson was aware of this

operating structure at the time of the agreement and expressed no objection to it.

The arbitrator found that Johnson breached the obligation of good faith and fair dealing that Wisconsin law imposes, as well as the express obligation of good faith and due diligence set forth in the agreement. He also concluded that Johnson was unjustly enriched by the capital investments Edman made to establish Johnson's presence in Panama. As damages, the arbitrator awarded Edman $457,986.39 for lost profits and $244,530.25 for reliance expenditures. In addition, he awarded Edman $30,825 in administrative fees and expenses. The total amount of the award exclusive of attorney's fees was thus $733,341.64.

Johnson did not accept this result. It filed a motion in district court to vacate the arbitral award pursuant to Chapter 1 of the Federal Arbitration Act, 9 U.S.C. § 10(a)(4) (FAA), which provides that a district court may vacate an arbitral award if "the arbitrators exceeded their powers." This had occurred, in Johnson's view, because the arbitrator (contrary to his representation) had addressed claims that Edman brought on behalf of Pinnacle, and in so doing, the arbitrator had disregarded a Wisconsin rule under which Edman lacked standing to assert Pinnacle's claims. This alleged mistake of law, Johnson argued, could have happened only if the arbitrator flatly disregarded the agreement's choice-of-law clause.

The district court denied Johnson's motion to vacate the arbitral award and instead granted Edman's motion

to confirm it. Noting the narrow scope of judicial review of an arbitral award and the fact that neither factual nor legal error is a sufficient ground for vacatur, the court first rejected the argument that the arbitrator exceeded his authority by adjudicating Pinnacle's claims. In fact, the court pointed out, the arbitrator expressly dismissed Edman's effort to recover for Johnson's interference with Pinnacle's contractual relations. By so doing, the arbitrator effectively took account of Johnson's assertion that Edman did not have standing to assert claims on behalf of Pinnacle. The district court also pointed out that the arbitrator cited Wisconsin law throughout his decision and thus there was no sign that the arbitrator had disregarded the parties' contractual choice of law.

Because the agreement contained a "loser pays" provision for attorney's fees, the district court also addressed this subject. Edman's agreement with its lawyer provided for a contingent fee in the amount of 33% of the award. Edman sought $252,127.93 (one-third the sum of the $733,341.64 arbitrator's award and $23,042.16 in prejudgment interest owed to Edman), plus another $57,480.05 in other costs. Relying on two affidavits from experts that Edman submitted and Johnson's silence on the point, the court decided that the contingent fee was commercially reasonable. It decided to lop $17,521.25 off of Edman's requested costs and to award $39,958.80. Johnson's two notices of appeal challenge the district court's decision on the merits to confirm the arbitral award and its award of fees and costs.

## II

Before addressing the merits of Johnson's claims, we think it worth highlighting a point about arbitral procedure. Both parties in this case based their arguments on Chapter 1 of the FAA, rather than Chapters 2 or 3 of that statute. Chapter 1 codifies the original Federal Arbitration Act of 1925, 43 Stat. 883; it applies to all domestic awards and to all other awards not otherwise covered by another legal instrument. But the FAA does not stop with Chapter 1. Chapter 2 implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, commonly called the New York Convention. See 9 U.S.C. § 201. Chapter 3 implements the Inter-American Convention on International Commercial Arbitration of January 30, 1975, known as the Panama Convention. The United States is a party to both of those Conventions.

Chapter 2 of the New York Convention and Chapter 3 of the Panama Convention provide for domestic enforcement of foreign arbitral awards. Any commercial agreement or arbitration that "involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states" is governed by the New York or Panama Convention, when both or all countries concerned are parties to the relevant Convention. 9 U.S.C. § 202; see also *Jain v. de Méré*, 51 F.3d 686, 689 (7th Cir. 1995) ("[A]ny commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable rela-

tionship with one or more foreign states, falls under the Convention."). Very few foreign awards fall outside the reach of one or the other Convention. The New York Convention now has 148 state-parties, see http://www.newyorkconvention.org/new-york-convention-countries/contracting-states (last visited Mar. 13, 2013), and the Panama Convention has 19, see http://www.oas.org/juridico/english/sigs/b-35.html (last visited Mar. 13, 2013). This award almost certainly falls under either the New York or the Panama Convention, depending on whether Edman is considered a British company (the British Virgin Islands are a British Overseas Territory) or a Panamanian company. If it is the former, then the New York Convention applies; if the latter, then pursuant to 9 U.S.C. § 305, the Panama Convention governs.

Chapters 2 and 3 of the FAA state that a Convention award may be vacated only on the grounds specified in the applicable Convention. 9 U.S.C. §§ 202, 302. This could be important in some cases, because the Convention grounds for vacatur are slightly different from those in Chapter 1 of the FAA. Compare 9 U.S.C. § 10(a), with New York Convention Art. V, and Panama Convention Art. 5; see also George A. Bermann, "*Domesticating*" *the New York Convention: The Impact of the Federal Arbitration Act*, 2 J. INT'L DISP. SETTLEMENT, no. 2, 317-32 (2011), *available at* http://jids.oxfordjournals.org/content/2/2/317.full#xref-fn-7-1 (last visited Mar. 13, 2013). (The full text of each of these provisions is set out in the Appendix to this opinion.) It is not clear whether a party may bring an action under Chapter 1 to vacate

an award issued by an arbitrator in a U.S. jurisdiction, but governed by the Convention. *Id.* If it made any difference to our case, we would need to decide whether the district court erred by allowing this action to proceed under Chapter 1 of the FAA, or if the party who might have been advantaged by analysis under the proper Convention might have waived its arguments. But, as we explain below, we do not regard this as a close case, and so we can save further consideration of that issue for another day.

## III

We already have alluded to the reasons why Johnson believes that this arbitral award should be vacated: the way in which the award took account of Pinnacle's injuries; the arbitrator's alleged refusal to follow Wisconsin law; and the approach the district court took to the fee award. Johnson acknowledges, and Edman emphasizes, that it is difficult to overturn an arbitral award. We uphold an award so long as "an arbitrator is even *arguably* construing or applying the contract and acting within the scope of this authority." *Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*, 495 F.3d 779, 782-83 (7th Cir. 2007) (emphasis added) (internal quotation marks omitted). We will not overturn an award because an arbitrator "committed serious error," or the decision is " 'incorrect or even whacky.' " *Id.* (quoting *Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006)); see also *Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.*, 86 F.3d 96, 100 (7th Cir. 1996) ("[T]hinly veiled attempts to

obtain appellate review of an arbitrator's decision . . . are not permitted under the FAA . . . . Factual or legal errors by arbitrators—even clear or gross errors—do not authorize courts to annul awards.") (internal quotation marks omitted).

In the context of labor awards, we have said that the only time when we will disrupt an award is if we find the arbitrator "effectively dispenses his own brand of industrial justice" because "there is no possible interpretive route to the award." *Local 15, Int'l Bhd. of Elec. Workers*, 495 F.3d at 783 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)); *Ganton Techs., Inc. v. UAW, Local 627*, 358 F.3d 459, 462 (7th Cir. 2004)). The same approach applies to commercial arbitration. Indeed, in two commercial cases we have held that even "manifest disregard of the law is not a ground on which a court may reject an arbitrator's award" unless it orders parties to do something that they could not otherwise do legally (*e.g.,* form a cartel to fix prices). *Affymax, Inc. v. Ortho-McNeil-Janssen Pharm., Inc.*, 660 F.3d 281, 285 (7th Cir. 2011); *George Watts & Son, Inc. v. Tiffany & Co.,* 248 F.3d 577, 580 (7th Cir. 2001).

This is not a case in which one can find any of the circumstances singled out in Section 10 of the FAA (or, for that matter, Article V of the New York Convention or Article 5 of the Panama Convention) as something that justifies a refusal to recognize or enforce an arbitral award. Johnson argues that the arbitrator exceeded his powers when he found, allegedly contrary to Wisconsin law, that Edman had standing to bring claims

on behalf of Pinnacle. This argument alludes to Section 10(a)(4) of the FAA, which permits vacatur of an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." But nothing so dramatic happened here. At worst, the arbitrator overlooked or misapplied one Wisconsin decision holding that plaintiffs' interest in corporations that were sisters to a mismanaged corporation did not support their standing to sue the parties responsible for mismanaging the victimized corporation. *Krier v. Vilione*, 766 N.W.2d 517, 520 (Wis. 2009). A proper reading of this case, Johnson argues, would have required the arbitrator to reject Edman's standing to assert any claims for Pinnacle's damages.

There are two incurable shortcomings to Johnson's argument. First, it is factually wrong. It assumes that the arbitrator granted Edman standing to assert the claims of Pinnacle, when in fact the arbitrator refused to do precisely that. Second, because the arbitrator permitted Edman to assert claims only for its own damages, and not Pinnacle's, the arbitrator's decision can be understood as consistent with *Krier*. The *Krier* court noted that "standing is satisfied when a party has a personal stake in the outcome," *id.* at 304, and Edman certainly had a personal stake in the enforcement of its contract with Johnson.

Since the arbitrator denied Edman standing to assert Pinnacle's claims, Johnson can contest only the finding that Edman itself was injured by the breach. Johnson

contends that the breach did not hurt Edman because all of the lost profits and investment were actually suffered by Pinnacle. But the losses did not stop with Pinnacle. The direct purchaser from Johnson was Edman; Pinnacle was performing downstream services for Edman. Paragraph 8.a of the agreement makes this clear when it provides that "[t]he relationship between [Johnson] and [Edman] is solely that of seller and buyer." The extent to which Edman stood to profit as an intermediary depended on how effectively it could distribute Johnson's products, through whatever distribution agents it saw fit to use. Pinnacle's profits provided a critical indicator of the value of the arrangement to Edman. The arbitrator properly looked at this evidence, along with other facts, and came to a conclusion. This was precisely what he was authorized to do, and even if some might question his conclusions, that is no reason to set aside the award.

## IV

Finally, we come to the question of attorney's fees. We review the district court's decisions on this aspect of the case only for abuse of discretion. *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 550 (7th Cir. 1999). Johnson's primary objection relates to the court's decision not to use the lodestar method for setting the fee award. Because we have held that this is the preferable methodology to use for awards under 42 U.S.C. § 1988 (the civil rights statute providing for attorney's fees for the prevailing party), see *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d

632, 639 (7th Cir. 2011), Johnson reasons that it must be used here as well.

This argument neglects the distinction between attorney's fees shifted by statute and those shifted by contract. It is true that we have required lodestar analysis for statutory fee-shifting schemes. *Id.* at 639 ("*In Title VII actions*, . . . [t]he lodestar approach forms the 'centerpiece' of attorneys' fee determinations, and it applies even in cases where the attorney represents the prevailing party pursuant to a contingent fee agreement.") (emphasis added). Fees shifted by contract are a different matter. Because fee-shifting occurs as a result of the parties' *ex ante* private ordering, we have held that fees shifted pursuant to a contractual provision "require reimbursement for commercially-reasonable fees no matter how the bills are stated." *Matthews v. Wisconsin Energy Corp., Inc.,* 642 F.3d 565, 572 (7th Cir. 2011) (citations omitted). The inquiry into commercial reasonableness "does not require courts to engage in detailed, hour-by-hour review of a prevailing party's billing records." *Id.* (upholding a contractual fee-shifting award even though the "request lacked any description of the work performed").

There is less need to police the reasonableness of fees shifted pursuant to a contract because the parties to a contract expressly consent to and define the terms of the fee shifting. If the parties do not want to pay an opposing party's contingent fee, they are free to write an agreement under which the prevailing party will be obliged only to pay fees calculated in accordance with

the lodestar method. On the other hand, contracting parties may want to preserve their ability to rely on a contingent fee arrangement to litigate a breach of the contract and have those fees reimbursed if they prevail. We see no reason to curtail parties' ability to define the terms of their fee arrangements with lawyers. This is quite different from a statutory obligation to pay the opponent's fees, where the party responsible for the fees does not consent to the arrangement and has no say in determining how fees will be calculated.

In *Matthews* we explained that the commercial reasonableness of an award pursuant to a contractual fee shift should be determined with reference to "the aggregate costs in light of the stakes of the case and opposing party's litigation strategy." *Id.* at 572. The district court's analysis supports its determination that the 33.3% contingent fee here was commercially reasonable. Edman submitted affidavits from two experts stating that a 1/3 contingent fee is common for commercial arbitration cases in Florida, where the arbitration took place. And the court noted that "commercially reasonable" contingent fees may be higher than a commercially reasonable lodestar rate because a contingent arrangement may include a premium that captures the attorney's upfront investment as well as the risk of losing the case. Johnson declined to disclose the fees it incurred (a sum that it presumably believed was reasonable) for the purpose of comparing Edman's contingent fees to its own expenses. Nor did Johnson provide any evidence showing Edman's 33% contingent fee is higher than the fee typically charged for comparable work in the

relevant area and therefore unreasonable. *Id.* The court did not an abuse its discretion in concluding that Edman was entitled to a 33.3% contingent fee.

**V**

In closing, we comment on Edman's request for sanctions under Federal Rule of Appellate Procedure 38 against Johnson. Rule 38 authorizes sanctions for appeals that the court determines are frivolous. An appeal is frivolous "if the appellant merely restates arguments properly rejected by the district court that are unsupported by a reasoned colorable argument for altering the district court's judgment." *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 565 (7th Cir. 2011). Although we have decided to deny Edman's motion, this is largely because the fee-shifting clause in the contract already assures that Edman will not bear the costs of this appeal. We note, however, that challenges to commercial arbitral awards bear a high risk of sanctions. See *Flexible Mfg.*, 86 F.3d at 101 (imposing sanctions). Attempts to obtain judicial review of an arbitrator's decision undermine the integrity of the arbitral process. Because of Johnson's appeal, Edman has been deprived not only of the value of the distributorship it expected to have for Panama, but also part of the value of the arbitration to which both parties agreed. The judgment of the district court is AFFIRMED.

APPENDIX

Federal Arbitration Act, 9 U.S.C. § 10(a):

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

New York Convention, Art. V (http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention.html) (last visited Mar. 13, 2013):

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

*(a)* The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

*(b)* The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

*(c)* The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award, which contains decisions on matters submitted to arbitration may be recognized and enforced; or

*(d)* The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

*(e)* The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the

country where recognition and enforcement is sought
finds that:

*(a)* The subject matter of the difference is not capable
of settlement by arbitration under the law of that
country; or

*(b)* The recognition or enforcement of the award
would be contrary to the public policy of that country.

Panama Convention, Art. 5 (http://www.oas.org/
juridico/english/treaties/b-35.html) (last visited Mar. 13,
2013):

1. The recognition and execution of the decision may
be refused, at the request of the party against which it
is made, only if such party is able to prove to the com-
petent authority of the State in which recognition
and execution are requested:

a. That the parties to the agreement were subject to
some incapacity under the applicable law or that the
agreement is not valid under the law to which the
parties have submitted it, or, if such law is not
specified, under the law of the State in which the
decision was made; or

b. That the party against which the arbitral decision
has been made was not duly notified of the appointment
of the arbitrator or of the arbitration procedure to be
followed, or was unable, for any other reason, to
present his defense, or

c. That the decision concerns a dispute not envisaged
in the agreement between the parties to submit to ar-

bitration; nevertheless, if the provisions of the decision that refer to issues submitted to arbitration can be separated from those not submitted to arbitration, the former may be recognized and executed; or

d. That the constitution of the arbitral tribunal or the arbitration procedure has not been carried out in accordance with the terms of the agreement signed by the parties or, in the absence of such agreement, that the constitution of the arbitral tribunal or the arbitration procedure has not been carried out in accordance with the law of the State where the arbitration took place; or

e. That the decision is not yet binding on the parties or has been annulled or suspended by a competent authority of the State in which, or according to the law of which, the decision has been made.

2. The recognition and execution of an arbitral decision may also be refused if the competent authority of the State in which the recognition and execution is requested finds:

a. That the subject of the dispute cannot be settled by arbitration under the law of that State; or

b. That the recognition or execution of the decision would be contrary to the public policy ("ordre public") of that State.