In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-1364 & 13-2331

PINE TOP RECEIVABLES OF ILLINOIS, LLC,

*Plaintiff-Appellant,*

*v.*

BANCO DE SEGUROS DEL ESTADO,

*Defendant-Appellee.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 6357 — **Marvin E. Aspen**, *Judge.*

ARGUED OCTOBER 30, 2013 — DECIDED NOVEMBER 7, 2014

Before EASTERBROOK and WILLIAMS, *Circuit Judges.*[1]

PER CURIAM. Pine Top Receivables ("Pine Top") brought
this action against Banco de Seguros del Estado, an entity
wholly owned by Uruguay. Pine Top claimed that Banco

[1] After the oral argument, circumstances arose that led Circuit Judge
Ripple to recuse himself. He did not thereafter participate in the consid-
eration or decision of these appeals, which are being resolved by a quor-
um of the panel. See 28 U.S.C. §46(d).

owes $2,352,464.08 under reinsurance contracts. Pine Top's complaint sought to compel arbitration but alternately proposed that the court enter judgment for breach of contract. Banco answered the complaint, and Pine Top moved to strike the answer for failure to post security under Illinois insurance law. The district court denied the motion, and Pine Top took an immediate appeal in reliance on the collateral order doctrine, which applies to orders about the posting of security. See *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949); *Habitat Education Center v. United States Forest Service*, 607 F.3d 453, 455 (7th Cir. 2010).

The district court later denied Pine Top's motion to compel arbitration, and Pine Top took a second interlocutory appeal on the authority of 9 U.S.C. §16. We discuss later some jurisdictional questions related to that appeal. For now it is enough to say that we affirm both of the district court's decisions.

## I. BACKGROUND

### A.

According to the allegations of the complaint, from 1977 to 1984 Banco entered into contracts under which it reinsured Pine Top Insurance Company ("Pine Top Insurance"). The complaint in this suit alleges that Banco still owes more than $2 million to the primary insurer.

Pine Top Insurance became insolvent and, in 1986, was placed into liquidation under the supervision of an Illinois court. After completing an accounting, its Liquidator sent a demand letter to Banco on July 31, 2008, seeking the claimed overdue balances on various reinsurance contracts. The Liquidator then sold Pine Top Insurance's accounts receivable to

Pine Top, which was established for the purpose of acquiring those rights. As the debt's new owner, Pine Top sought to collect. Banco disputed the amounts claimed, and Pine Top filed the present action.

## B.

In moving to strike Banco's answer, Pine Top contended that, under the Unauthorized Insurers Process Act as adopted in Illinois, 215 ILCS 5/123, Banco must post pre-answer security in the full amount of the disputed debt. Banco opposed the motion, contending among other things that the Foreign Sovereign Immunities Act ("FSIA") bars any requirement of prejudgment security. Pine Top acknowledges that Banco's status as an entity wholly owned by Uruguay brings it within the FSIA.

The district court denied the motion to strike. It concluded that the FSIA's prohibition on attaching a foreign state's property prevents application of the Illinois security requirement. The court concluded that the security would be an "attachment" within the meaning of the FSIA. It relied principally on *Stephens v. National Distillers & Chemical Corp.*, 69 F.3d 1226 (2d Cir. 1995), which held that a similar security requirement under New York law is equivalent to an attachment. The district court also held that Banco had not waived its FSIA immunity.

The district court later determined that Pine Top has no right to arbitrate under the terms of the reinsurance treaties, because the assignment executed by the Liquidator gave Pine Top only limited rights to the collections of certain debts, not all rights and duties under the treaties.

## II. DISCUSSION

Two orders of the district court are before us. The first order, in appeal No. 13-1364, denied Pine Top's motion to strike Banco's responsive pleading for failure to comply with the security requirement of 215 ILCS 5/123(5). The second, the subject of appeal No. 13-2331, denied Pine Top's motion to compel arbitration and dismissed those counts of the complaint that demanded arbitration. We address these matters in turn.

### A. Motion to Strike, Appeal No. 13-1364

Under 215 ILCS 5/123(5), before an insurer that is not specifically authorized to do business in Illinois may file any responsive pleading in a suit against it, it must first deposit with the clerk of the court security sufficient to satisfy any final judgment in the action. Although this is phrased as a pleading rule, the parties treat it as substantive and we do likewise without deciding whether the parties' assumption is correct. (If it is procedural, federal rules would control, see *Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980), and federal law does not require out-of-state insurers to post security.)

Banco does not contend that it is "authorized" for the purpose of §5/123(5), but it does contend, and the district court held, that the FSIA blocks enforcement of Illinois's requirement. Pine Top raises several arguments in reply: (1) that the prejudgment security is not an attachment within the meaning of the FSIA; (2) that, if the security would otherwise be an attachment and be prohibited by the FSIA, Banco waived its immunity; and (3) that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–15, prevents application of the FSIA. We address these contentions in turn.

## 1. "Attachments" Prohibited by the FSIA

One section of the FSIA provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state *shall be immune from attachment arrest and execution* except as provided in sections 1610 and 1611 of this chapter.

28 U.S.C. §1609 (emphasis added). The parties dispute whether the security requirement in the Illinois Code is an "attachment" within the meaning of §1609. In Pine Top's view, the term refers to a historical procedure to obtain jurisdiction over a foreign sovereign; Banco contends that it is not so restricted and covers all security requirements designed to ensure that a judgment can be enforced.

No case from this circuit addresses whether prejudgment security is an "attachment" for FSIA purposes.[2] We therefore must begin with the text of the statute. *Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2256 (2014) ("[A]ny sort of immunity defense made by a foreign sovereign must stand on the Act's text. Or it must fall."); see also *Senne v. Village of Palatine*, 695 F.3d 597, 601 (7th Cir. 2012) (en banc). The FSIA does not define the term "attachment arrest and execution", nor does §1609 make any other reference that would clarify whether it covers only jurisdictional attachments or attach-

---

[2] We noted in *International Insurance Co. v. Caja Nacional Ahorro y Seguro*, 293 F.3d 392, 397 n.12, 399 n.13 (7th Cir. 2002), that the attachment provision "has been interpreted to include pre-judgment security," citing *Stephens*. We "express[ed] no opinion on whether attachment arrest and pre-judgment security are identical for purposes of the FSIA," however, because the issue was not raised by the parties, and because, in any event, we concluded that the defendant had waived any immunity.

ments to secure judgments. However, the following section provides important guidance about the term's likely breadth.[3] Section 1610 defines exceptions to the general rule of immunity set forth in §1609; it explains when property, which otherwise would be immunized under §1609, is not immune from attachment under the Act:

> (d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—
>
> > (1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and
> >
> > (2) *the purpose of the attachment is to secure satisfaction of a judgment* that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

28 U.S.C. §1610 (emphasis added). Section 1610(d) shows that several conditions must be met before prejudgment attachment of a foreign sovereign's property is allowable: (1) the property must be used for a commercial purpose; (2) there must be an explicit waiver; and (3) the purpose of the attachment must be to secure satisfaction of a judgment rather than to obtain jurisdiction. If we accepted Pine Top's reading—that §1609 deals exclusively with jurisdictional at-

---

[3] See *Dolan v. United States Postal Service*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute[ ] … ."); *United States v. Webber*, 536 F.3d 584, 593 (7th Cir. 2008) (noting that context and structure can illuminate statutory meaning and collecting cases).

tachments—§1610(d) would accomplish nothing; it would allow waiver of immunity only for a class of property to which no immunity attached by virtue of the prior section. That is, unless §1609 includes attachments "the purpose of [which] is to secure satisfaction of a judgment," §1610(d) is superfluous.

Pine Top points us to various references in the legislative history that it believes support the opposite view, but none directly concerns the text of §1609. Furthermore, in light of the meaning manifest in the structure and context of the statute, resort to these indirect references in the history is neither necessary nor useful.

Our conclusion is supported by the only other circuit to consider a similar issue. In *S&S Machinery Co. v. Masinexport-import*, 706 F.2d 411, 418 (2d Cir. 1983), the district court had issued two orders affecting the domestic property of a foreign defendant: a direct order of attachment and an injunction against negotiation of letters of credit. When the defendant objected that the orders violated the FSIA, the district court dissolved both orders, and the Second Circuit affirmed. It concluded that dissolution of the injunction in addition to the attachment was necessary because the "FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property." *Id*. at 418. *S&S Machinery* held that prejudgment "attachment," properly understood, included "any other means to effect the same result." *Ibid*.

In *Stephens* the Second Circuit considered whether a prejudgment attachment requirement set by a New York insurance statute was barred by the FSIA. As in the case before us,

the trustee for an insolvent domestic insurance company sought reimbursement from foreign reinsurers. The applicable New York statute requiring pre-answer security was materially identical to the Illinois statute at issue in the present case.

With *S&S Machinery* as a backdrop, the court in *Stephens* had no difficulty in concluding that the security requirement was barred by the FSIA:

> The pre-judgment security requirement before us would force foreign sovereign [reinsurers] to place some of their assets in the hands of the United States courts for an indefinite period. During that time, the [reinsurers] would have no access to those assets. All this is precisely the same result that would obtain if the foreign sovereign's assets were formally attached. There is, therefore, no significant distinction between New York's security requirement and an attachment of the property.

69 F.3d at 1229.

We agree with the Second Circuit that the statutory term "attachment" has a broader meaning than that urged by Pine Top. In addition to our independent statutory analysis, we acknowledge, as the Second Circuit did, that not unlike many federal statutes incorporating different state procedures, a single unified term or group of terms stands as a placeholder for a generic understanding rather than a reference to a particular state-law procedural vehicle or historical practice. For that reason, *Stephens*'s holding that the matter of whether a procedural requirement is barred by FSIA immunity should turn on that requirement's effect—rather than its procedural particulars—is one that makes sense of the statutory language. Accordingly, we conclude that the prejudgment security requirement of 215 ILCS 5/123(5) is an "attachment" under the FSIA.

### 2. Waiver of Immunity

Pine Top next argues that any immunity available to Banco under the FSIA has been waived under §1610(d). Pine Top predicates its assertion of a waiver on (1) Banco's agreement to a reserves clause in the reinsurance contracts and (2) its decision to transact reinsurance business in the state of Illinois, which imposes the security requirement.

First, we examine the language of the reinsurance contracts. The clauses cited by Pine Top required Banco, during the term of its agreement, to "deposit with" Pine Top Insurance "the amount of reserves in respect of [Banco's] share of … unearned premiums [and] outstanding losses and loss expenses," and to do so quarterly and within a month of a request. These clauses set up a structure designed to ensure that the secondary insurer maintains sufficient cash reserves to meet its ongoing obligations. Such an arrangement is distinctly different, conceptually and practically, from a waiver of protection from a judicial order of prejudgment security. The reserves arrangement ensures the smooth operation of the contract during its term; the statutory security provision requires a party to surrender its assets to a court potentially long after the contract ends. The contracts' language supports this distinction. It provides that the reserves are calculated routinely during the term of the contract; this does not even hint at consent to post security long after the contract's end to satisfy a potential judgment. Pine Top has not requested the placement of reserves pursuant to the contract, but rather a judicial order of security. The reserves clauses, therefore, do not waive the protection afforded by the FSIA.

That Banco transacted business with an entity located within Illinois likewise does not amount to consent to the

state's scheme. Banco may have been unaware of the security requirement, or it may well have agreed to transact business believing that the FSIA would protect it.

Moreover, any "waiver" that we could discern either from the transacting of business with an entity in Illinois or from reserves clauses that do not speak to orders of pre-answer security in judicial proceedings would not be "explicit," and therefore would not come within the statute's exemption. See 28 U.S.C. §1610(d)(1); *S&S Machinery*, 706 F.2d at 416 ("[A] waiver of immunity from prejudgment attachment must be explicit in the common sense meaning of the term: the asserted waiver must demonstrate unambiguously the foreign state's intention to waive its immunity from prejudgment attachment in this country.").

Finally, Pine Top's reliance on *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255 (2d Cir. 2003), is unavailing. *Mutual Marine* reviewed an order by an arbitrator that Banco post security during arbitration proceedings. Banco challenged the order under the FSIA. The Second Circuit found an explicit waiver of immunity from attachment in contract language authorizing the arbitrator to abstain from following strict rules of law and to proceed without judicial formalities. Further, the contract at issue in *Mutual Marine* required Banco to obtain a letter of credit from a financial institution in order to secure its obligations. The court read these two provisions as demonstrating a "clear and unambiguous intent to waive all claims of immunity in all legal proceedings." *Id*. at 261. *Mutual Marine* is also not analogous to our situation because the Second Circuit was employing a different standard of review: it could not overturn the arbi-

trator's security requirement if there was any justification for the arbitrator's decision. See *id*. at 260.

Accordingly, we conclude that there has been no explicit waiver by Banco of the protections afforded by the FSIA.

### 3. FSIA and McCarran-Ferguson

Having determined that the prejudgment security under 215 ILCS 5/123(5) would be an attachment within the meaning of the FSIA, we turn to Pine Top's contention that the McCarran-Ferguson Act prevents application of the FSIA. The McCarran-Ferguson Act provides, in relevant part,

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance … .

15 U.S.C. §1012(b). Pine Top supposes that, if the FSIA is inapplicable (because it does not "specifically relate" to insurance), then the state security requirement must be enforced. That's not so clear. Maybe knocking out the FSIA for the insurance industry would return us to the older regime of common-law sovereign immunity discussed in *NML Capital*. Maybe other considerations would block the enforcement of the state statute. See *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). But we need not decide, because Pine Top has forfeited any argument resting on the McCarran-Ferguson Act.

In the district court, Pine Top filed its complaint demanding arbitration, or, in the alternative, relief in the amount of the claimed debt. Banco answered; Pine Top moved to strike Banco's pleading because it had not posted pre-answer security; Banco responded to the motion by claiming that the se-

curity requirement is barred by the FSIA. Pine Top's reply conceded the general applicability of the FSIA, raising only its contentions, explored above, that the FSIA's provisions prohibit only prejudgment "attachment" of the property of a foreign sovereign or its instrumentality. Specifically, Pine Top argued that the court needed to decide "two primary questions: first, whether the relief sought is, in fact, an 'attachment' of a sovereign's property, and second, whether the exception of section 1610(d) [concerning waiver of immunity] applies." In the context of an argument that "[t]he purposes" of the Illinois statute "distinguish it from ordinary pre-judgment attachment rules," Pine Top referenced the Illinois statute as a "proper exercise of the state's authority to regulate access to the business of insurance, authority which has been enshrined in federal law since at least 1945." This sentence is followed by a citation to the "purposes" section of the McCarran-Ferguson Act, 15 U.S.C. §1011, without mention of §1012(b).

The district court agreed with Banco regarding the applicability of the FSIA. Pine Top then moved under Fed. R. Civ. P. 59(e) to amend or correct the district court's order. Its motion contended that *Stephens* "incorporates a serious misunderstanding of the purpose and structure of the FSIA" and that the court should have rejected its reasoning. On reply in support of this motion, Pine Top still did not invoke §1012(b). Instead, it contended that Banco and the district court had erred in discussing a portion of *Stephens* that examined the McCarran-Ferguson Act for the light it shed on the meaning of attachment. The gravamen of Pine Top's argument was that *Stephens* had misinterpreted the FSIA, and its discussion of McCarran-Ferguson was a side note.

We therefore conclude that Pine Top forfeited this issue in the district court. The meaning of the FSIA was the issue raised and debated by the parties throughout the district court proceedings, and we see no direct argument that the McCarran-Ferguson Act makes the FSIA inapplicable to the insurance business.

When Banco contended in this court that Pine Top's McCarran-Ferguson argument had not been preserved in the district court, Pine Top responded by acknowledging that "there is no actual citation to McCarran Ferguson in [Pine Top's] briefs … to the district court." It asserted, however, that its briefs were "replete with references to the regulatory policy of the state of Illinois and the threat to that policy if the FSIA were interpreted to interfere with it." It also claimed that its scattered references to state authority to regulate insurance and to the year 1945 (the year of McCarran-Ferguson's enactment) make no sense outside of reliance on §1012(b). In Pine Top's view, in the district court, its "fundamental argument was that, because of McCarran Ferguson, the term 'attachment' should be interpreted in a way that did not conflict with governing state insurance law."

We are not persuaded by this argument. The district court was not required to intuit the significance of the year 1945 and to interpret isolated references to that year as referring to state authority to regulate insurance. Nor was it required to understand a generic mention of the McCarran-Ferguson Act as an implicit request to hold a federal statute inapplicable by virtue of §1012(b). See *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (noting that "[i]t is not the obligation of [a] court to research and construct the legal arguments open to parties, especially when they are represent-

ed by counsel," and that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived" (internal quotation marks omitted)). Furthermore, Pine Top's only substantial references to McCarran-Ferguson in the district court occur in a reply brief in support of a 59(e) motion—not in the original motion to strike or even the opening brief in support of 59(e)—and such arguments are routinely deemed forfeited. See *Sigsworth v. City of Aurora*, 487 F.3d 506, 512 (7th Cir. 2007) ("[I]t is well-settled that a Rule 59(e) motion is not properly utilized to advance arguments or theories that could and should have been made before the district court rendered a judgment … ." (internal quotation marks omitted)).

Because Pine Top has not preserved its argument that the FSIA does not apply to the insurance business, we do not address whether that argument would succeed on the merits.

**B. Arbitration Under the Panama Convention**

**1. Appellate Jurisdiction**

The district court's order declining to refer the dispute to arbitration is appealable only if it falls within a specific exception to the final judgment rule. See *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 661 (7th Cir. 1998). The only candidate for such an exception is 9 U.S.C. §16(a), which authorizes immediate appeal from various orders relating to arbitration:

An appeal may be taken from—

(1) an order—

(A) refusing a stay of any action under section 3 of this title,

(B) denying a petition under section 4 of this title to order arbitration to proceed,

(C) denying an application under section 206 of this title to compel arbitration,

(D) confirming or denying confirmation of an award or partial award, or

(E) modifying, correcting, or vacating an award;

(2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

(3) a final decision with respect to an arbitration that is subject to this title.

In their initial briefs to this court, both parties recited that Pine Top had sought to compel arbitration under §4 of the Federal Arbitration Act, 9 U.S.C. §4. They further submitted that we had jurisdiction over this appeal under 9 U.S.C. §16(a)(1)(B) or (C). Sections 4 and 16 appear in the Federal Arbitration Act ("FAA") proper—which is to say, chapter 1 of title 9 of the United States Code. However, this is a suit involving a domestic corporation and an entity wholly owned by Uruguay. Both the United States and Uruguay are signatories of the Inter-American Convention on International Commercial Arbitration (the "Panama Convention"), and it is this Convention, implemented by chapter 3 of the Federal Arbitration Act, that controls. See *Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1024–25 (7th Cir. 2013) (noting the spheres of applicability of chapters 1, 2, and 3 of the FAA). Because the parties' reliance on chapter 1

of the FAA gave us pause, we requested supplemental briefing.

Both parties then shifted their focus to chapter 3. Arguing in support of appellate jurisdiction, Pine Top submits that, in a proceeding under chapter 3, we still ought to follow chapter 1 provisions (including 9 U.S.C. §16) to the extent that they are not inconsistent with chapter 3. Pine Top maintains that this suit is effectively a proceeding under §4, which allows §16(a)(1)(B) to supply appellate jurisdiction. Banco counters that without a statutory authorization specific to chapter 3 we must dismiss the interlocutory appeal.

We begin with a detailed look at the statute, and specifically at the interplay among the three chapters of the FAA. Chapter 1, the original FAA, enacted in 1925, applies directly to domestic arbitrations and those not otherwise covered by a legal instrument, *Johnson Controls*, 712 F.3d at 1024, but its provisions apply by incorporation to other arbitrations as well. Chapter 1 provides, in §4, that a party aggrieved by another's failure to arbitrate a dispute under a written agreement

> may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. … The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

9 U.S.C. §4. Section 4 also specifies procedures for a district court considering such a petition.

Each other chapter of the FAA implements an international convention to which the United States is a party. Chapter 2 implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, known as the New York Convention, for which there are nearly 150 contracting states. Commercial arbitration agreements between citizens of contracting states fall under the Convention, as do agreements between citizens of the United States, when they involve property, performance or enforcement abroad or "some other reasonable relation with one or more foreign states." 9 U.S.C. §202. Chapter 3 implements the Panama Convention, which has 19 state parties. The Panama Convention incorporates the same rules of scope as the New York Convention, see §302 (incorporating §202), except that it also provides that when the requirements for both Conventions are satisfied, if the majority of parties to the agreement are citizens of Panama Convention state parties, that Convention, rather than the New York Convention, controls. 9 U.S.C. §305. Thus, the present case is governed by the Panama Convention.

The three chapters track each other in significant respects—not only because they contain many parallel provisions but also because chapters 2 and 3 contain incorporation provisions. Chapters 2 and 3 contain separate authorization for a party to petition a district court having jurisdiction over the controversy to order the parties to arbitrate. Those provisions—sections 206 and 303—speak in more general terms than §4, and they include little procedural detail. Both chapter 2 and chapter 3 also include a provision calling for the application of chapter 1 "to actions and proceedings brought under this chapter to the extent" that they do not conflict. 9 U.S.C. §§ 208, 307. A party seeking to compel arbi-

tration generally proceeds formally under §4, §206, or §303, depending on which chapter applies; however, because of the residual application of chapter 1 procedures found principally in §4, the proceedings do not necessarily look markedly different.

There are, however, two significant differences between the New York and Panama Conventions that are potentially significant in our jurisdictional analysis. The first is that, in 1988, after the New York Convention had been implemented but before the implementing legislation for the Panama Convention, Congress amended chapter 1 to add §16. Section 16 is the only section of the FAA defining appropriate appellate jurisdiction in federal court proceedings related to the FAA, and it replaced a system previously used by courts of appeals but ultimately rejected by the Supreme Court. See generally *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279–88 (1988). New §16 added language permitting interlocutory appeals for motions or applications seeking to compel arbitration under the only two chapters then existing in the FAA—chapters 1 and 2. Specifically, it provides that a party whose petition under §4 to compel arbitration is denied may seek immediate appeal of that order.

When Congress added chapter 3 to implement the Panama Convention two years later, it did not amend §16. Accordingly, there is no direct reference in §16 to any chapter 3 proceedings. The problem posed by a lack of specific reference to the Panama Convention proceedings in §16 is one that has escaped the attention of our sister circuits. It has also, in large measure, escaped mention by commentators, although the little commentary that exists supports the view that §16 applies. See John P. Bowman, *The Panama Convention*

*and Its Implementation Under the Federal Arbitration Act*, 11 Am. Rev. Int'l Arb. 1, 95 (2000).[4]

If this case were governed by chapter 1 or 2, to which §16 refers, we clearly would have jurisdiction. Because it is not, we must consider whether the incorporation provisions in chapter 3 make §16 applicable. There are two: 9 U.S.C. §302, which incorporates much of the New York Convention, and 9 U.S.C. §307, which provides for residual application of chapter 1 in its entirety "to actions and proceedings brought under this chapter to the extent chapter 1 is not in conflict" with chapter 3 or the Panama Convention itself.

The first of these alternatives, §302, is not helpful in our present inquiry. The only portion of §16 that authorizes interlocutory appeals under the New York Convention is §16(a)(1)(C), which allows appeals from applications to compel under 9 U.S.C. §206. But the Panama Convention incorporates only specific provisions of the New York Convention, and §206 is not among them.

We therefore turn to the remaining possibility: that the provision relating to the residual application of chapter 1, found in §307, provides this court with authority. After care-

---

[4] "When adopting Chapter 3 of the federal act in 1990, Congress did not amend Section 16 to make specific reference to Section 303(a), the new chapter's counterpart to Sections 4 and 206. Section 16's silence with regard to Section 303(a) should not, however, be interpreted as relegating orders issued under Chapter 3 to a different appellate regime or, specifically, as allowing appeal of interlocutory orders compelling arbitration under Section 303(a). By providing for application of Chapter 1 to actions and proceedings brought under Chapter 3, Section 307 makes Section 16 applicable to interlocutory orders compelling arbitration under Section 303(a) and the Panama Convention."

ful study, we believe that this residual clause confers appellate jurisdiction over an order denying arbitration. Because chapter 3 provides essentially no guidance to the district court with respect to the conduct of enforcement proceedings, a district court must turn to §4 for vital procedures, and §307 permits this borrowing. The application of §16 follows, because §16(a)(1)(B) is linked to §4.

Banco suggests that, while such a result might be plausible where a case could have been brought directly under §4 and satisfies all of §4's requirements, it is implausible where a conflict exists between §303 and a part of §4. Specifically, Banco invites the court's attention to the terms of several of the reinsurance contracts, which provide that arbitration is to take place in Phoenix. It notes that §4 permits a district court to order that arbitration proceed only within the judicial district in which the petition is filed. Because a district court considering this case under §4 could not order relief consistent with the agreement, Banco argues that we must disregard §4, and with it §16(a)(1)(B).

We do not believe that the statute should be construed this way. The portion of §4 limiting the place of arbitration conflicts with §303, which allows the court to order arbitration in whatever place the agreement provides. But the other procedural specifications in §4 are consistent with §303, so §307 incorporates them. Just as importantly, nothing outside of §4 tells a district court what procedures to employ in considering a §303 motion. Section 4 provides the procedures a federal court uses to determine the arbitrability of any dispute under any chapter of the FAA, with only a few exceptions.

Moreover, we previously have considered circumstances in which only part of §4 could apply to a case before us, and we had no difficulty in making that application and excising the inconsistent provision. In *Jain v. de Méré*, 51 F.3d 686 (7th Cir. 1995), we held that when a sole provision in §4 conflicted with those under the New York Convention, courts could still use those non-conflicting portions of §4. *Jain* involved an agreement to arbitrate that did not specify a location, and the petitioner sought, by way of the incorporation provision in §208, to apply the rule of §4 that a district court may order arbitration "within the district" in which the court sits. De Méré, the respondent, attempted to block the court from applying §4. He argued that §4 could not apply because its own limitations were not satisfied. We rejected his argument. The upshot was a recognition that the incorporation provision in chapter 2 allowed us—indeed, required us—to excise those individual portions of §4 that cause conflict while still applying those portions that did not.

We see no material distinction in a case under the Panama Convention. The authority conveyed by §303 to order arbitration at any location consistent with the agreement overrides only a single portion of §4. The rest of §4 is consistent with the Panama Convention and applies to chapter 3 through the residual clause of §307. The text of §16(a)(1)(B) does the remaining work.[5]

---

[5] Although the context is not relevant in the present case, we note that the Supreme Court has rejected at least one overly restrictive reading of §16. See *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 627–29 (2009).

**2. Merits**

Pine Top seeks to enforce the arbitration clauses in the re-insurance policies between Pine Top Insurance and Banco. The district court held that the Purchase Agreement (by which Pine Top acquired its rights from the Liquidator) did not transfer a right to demand arbitration.

Pine Top's contentions fit into four categories: (1) that the applicable language of the Purchase Agreement indeed transfers the right to demand arbitration; (2) that, to the extent the Purchase Agreement is silent, the Uniform Commercial Code fills the gap and transfers the right; (3) that parol evidence suggests that the Liquidator and Pine Top meant to transfer the right, and that such evidence was accorded insufficient weight by the district court; and (4) that, because Banco raises defenses to liability based on the policies' terms, it is equitably estopped from resisting application of all portions of the policies. We address these contentions in turn.

**a. Language of the Agreement**

Pine Top's first argument is that the Purchase Agreement transfers the right to demand arbitration. It relies on the following provisions:

The agreement defines the purchased "Debts" as:

> The net balances due … or which may become due … from the … Debtors to the Assignor pursuant to the terms of the Policies; … including all rights securing payment of such balances, such as funds in the hands of brokers, letters of credit or collateral pledged with respect to such Debts.

Further, under Clause 2.1

> In consideration of [payment] by the Assignee to the Assignor, … the Assignor shall … assign to the Assignee all of its rights, ti-

tle, benefit and interest in the Debts absolutely and with full title

… .

Finally, and most importantly in Pine Top's view, under Clause 5.2,

> As of the Effective Date of this Agreement and by virtue of this Assignment Agreement, Assignor authorizes Assignee to demand, sue for, compromise and recover all amounts as now are, or may hereafter become, due and payable for or on account of the Debts. Assignor grants to Assignee full authority to do all things necessary or useful to enforce the Debts and Assignor's rights thereunder pursuant to this Assignment Agreement. It is specifically understood and agreed, however, that Assignee's rights under this paragraph are discretionary and Assignee may exercise or decline to exercise such powers at Assignee's sole option. Nothing in this Agreement shall create any obligation on the part of Assignee to any person other than the Assignor.

Pine Top relies principally on the language in Clause 5.2 that it acquired "full authority to do all things necessary or useful to enforce the Debts and Assignor's rights thereunder pursuant to this Assignment Agreement." As the district court noted, this provision could be read to encompass the arbitration clauses. However, when Clause 5.2 is read in conjunction with the preceding section, that interpretation becomes implausible. Under Clause 5.1, Pine Top acquired the right to obtain information "relating to the Debts or any Policies from which such Debts might have arisen, to the same extent and under the same conditions as the Assignor could have done so in an exercise of its contractual rights." This shows that the drafters of the Purchase Agreement knew how to communicate a full and complete transfer of rights, but, with respect to the debts, authorized a more limited transfer.

The district court's analysis of the terms is sound. The contract specifically vests full title in the debts and authoriz-

es Pine Top to "demand, sue for, compromise and recover all amounts" of those debts. The "necessary or useful" language follows this specific assignment of rights and authorizes actions related to the four specifically conferred rights (demand, sue, compromise, recover), but does not incorporate new or additional rights that are themselves "creature[s] of contract," *Dunmire v. Schneider*, 481 F.3d 465, 467 (7th Cir. 2007). Not only is "demand arbitration" not specifically included in the transferred rights, it is of an entirely different character. Ownership of a debt may imply the right to recover the debt absent some legal impediment, but it does not imply the right to use a means not otherwise established as a right under the law. The policies themselves are not transferred under the Purchase Agreement. Clause 2.4.1 says exactly that: "The assignment … shall not … be construed to be a novation or assignment of the Policies."

Finally, as the district court noted, the policies' right to demand arbitration is reciprocal, and the Purchase Agreement states that Pine Top does not accept any responsibility to anyone other than the Liquidator. ("Nothing in this Agreement shall create any obligation on the part of Assignee to any person other than the Assignor.") The Liquidator did not give Pine Top an *obligation* to submit to arbitration at Banco's request. It is not clear how the Liquidator could transfer a one-way right to demand arbitration without imposing any reciprocal obligation on Pine Top. (Banco has not argued that an assignment of the debt, without Pine Top's consent to arbitration at Banco's behest, is invalid.)

### b. UCC as Gap-Filler

Pine Top next contends that UCC terms fill any necessary gaps and establish that a transfer of rights in the debt in-

cludes a right to arbitration. The application of the UCC provision is a matter of controversy between the parties, but one that we need not resolve. Even if the UCC does apply, Pine Top's arguments are unpersuasive. The provisions of the UCC on which Pine Top relies cover contractual language assigning "the contract" or "all my rights under the contract." 810 ILCS 5/2–210(5). If an assignment includes such language, the UCC tells us that the transfer is subject to "all terms of the agreement." 810 ILCS 5/9–404(a). If the assignment at issue in this case had employed such language in transferring rights in the debt to Pine Top, resort to the UCC would be unnecessary; the agreement itself would have transferred the right to demand arbitration. But that's not what the assignment says.

### c. Parol Evidence of Intent

Pine Top further submits that the only sensible reading of the Purchase Agreement is that it acquired the arbitration authority because the Liquidator was charged with obtaining as much for the assets as possible and had authority to sell any asset, including the right to demand arbitration. In support of its argument, Pine Top cites affidavits submitted in the district court from the Liquidator's staff verifying that the Liquidator tried to maximize the price by selling all available assets.

The district court saw no reason to consider the affidavits, given that it had concluded that the contract was unambiguous. Neither the affidavits nor anything else Pine Top proposed to offer concerns discussions during negotiations or the meaning of any concrete language in the documents. The district court found, and we concur, that it is unhelpful

because it moved the issue no further than the allegations of the complaint themselves.

Pine Top is right to say that Illinois does not forbid all parol evidence when offered to resolve a dispute that involves persons other than the contracting parties. See *Quality Lighting Inc. v. Benjamin*, 227 Ill. App. 3d 880, 886–87 (1992). However, this permissive approach does not alter the ordinary rule that parol evidence is useless unless it illuminates the meaning of a contract's language. This evidence doesn't.

### d. Estoppel

Pine Top's final argument is that Banco is estopped from denying that Pine Top received a right to arbitrate. According to Pine Top, Banco itself presented defenses that depend on the language of the reinsurance treaties; this means that Banco must concede that all of this contractual language governs the parties' relations. Pine Top relies on *Hughes Masonry Co. v. Greater Clark County School Building Corp.*, 659 F.2d 836, 838–39 (7th Cir. 1981). This argument merits little attention. *Hughes* involved a set of contracts for school construction through which a county designated J.A. as architect and project manager and Hughes as mason; each entity executed contracts separately with Clark, but Hughes's contract specified duties that J.A. would perform as project manager of the entire construction project. Hughes later sued J.A. for claims in tort, but the court stated that, in truth, they were claims sounding in contract, for the failure of J.A. to perform as designated under the agreements. When J.A. attempted to arbitrate as provided in the Hughes-Clark contract, Hughes defended by claiming that J.A. had no right to enforce the arbitration clause. We were not persuaded; we determined that Hughes had commenced an action for breach of terms

of a contract by J.A., and that it would be inequitable to refuse J.A. the procedural remedies provided in that same document.

The situation before us is entirely different. Pine Top had absolutely no relationship to the underlying contracts other than an after-acquired right to collect certain debts. The validity and amount of those debts cannot be determined other than by looking to the terms of the agreement; this compelled Banco to refer to the contract. Unlike *Hughes*, there is no set of reciprocal obligations to enforce. The reinsurance contracts are simply the backdrop by which the amount of debt is established. They do not otherwise govern the current parties' rights.

## Conclusion

The district court did not err in allowing Banco to file responsive pleadings, because the Illinois statute requiring pre-answer security cannot be applied to Banco consistent with the FSIA. Banco did not waive its immunity in the manner allowed by that statute, and Pine Top forfeited its current contentions that the McCarran-Ferguson Act allows a state rule to govern. On the arbitration question, we first hold that denials of motions to compel arbitration under the Panama Convention are immediately appealable under 9 U.S.C. §16(a)(1)(B). On the merits, the contract language, reasonably read, does not transfer the right to demand arbitration. The orders of the district court are affirmed.